**WASTE MANAGEMENT OF COLO-RADO, INC., a Colorado corporation, Plaintiff–Appellee,**

v.

**CITY OF COMMERCE CITY, Colorado, a municipal corporation; Jerry Flannery, in his official capacity as the City Manager of the City of Commerce City; Roger Tinklenberg, Hearing Officer, and in his official capacity as the Acting Deputy City Manager of the City of Commerce City; and Carol Enninga, in her official capacity as the acting Director of Finance of the City of Commerce City, Defendants–Appellants.**

No. 09CA1083.

Colorado Court of Appeals,
Div. II.

April 15, 2010.

Holland & Hart LLP, Alan Poe, Greenwood Village, Colorado; Holland & Hart LLP, Christina Gomez, Denver, Colorado, for Plaintiff–Appellee.

Murray Dahl Kuechenmeister & Renaud LLP, M. Patrick Wilson, Christopher M. Price, Denver, Colorado, for Defendants–Appellants.

Opinion by Judge GABRIEL.

Defendants, the City of Commerce City, Jerry Flannery, Roger Tinklenberg, and Carol Enninga (collectively, the City), appeal the district court's order granting summary judgment for plaintiff, Waste Management of Colorado, Inc. (Waste Management). The court determined that Waste Management's provision of so-called "roll-off" containers to customers and its contracts with transportation companies to haul trailers for it were not subject to tax under the City's Sales and Use Tax Code (the Code), because neither type of transaction involved the furnishing of tangible personal property within the meaning of the Code. We agree with the district court and therefore affirm.

## I. Background

### A. Roll–Off Service

Waste Management provides waste removal, disposal, and recycling services to customers in the City. In addition to curbside service, Waste Management offers a "roll-off service" for customers with substantial amounts of waste or recyclable materials. When a customer contracts with Waste Management for this service, Waste Management transports to the customer's location a large steel container with rollers on the bottom for the customer's use in disposing of waste or recyclables. This container is transported by loading it onto a trailer or chassis and hauling it by truck or tractor. Waste Management owns the roll-off containers, paid sales or use tax to the City when it purchased them, and uses them solely for providing the roll-off service.

When a container is full or the customer is otherwise ready to have the container picked up, Waste Management picks it up. At that time, depending on the customer's needs, Waste Management might replace the full container with another container. Waste Management then transports any materials

in the full roll-off container to a disposal site, recycling facility, or transfer station.

Under Waste Management's typical service agreement for roll-off service, customers pay a fee each time Waste Management removes the roll-off container. There is no separate charge in the agreement for the roll-off containers themselves. Nor does Waste Management sell, lease, rent, or license the use of roll-off containers to its customers. And, as pertinent here, Waste Management did not collect sales tax from its customers in the City with respect to its fees and charges for providing waste removal and disposal services, including its roll-off services.

### B. Waste Hauling

During the time period relevant here, Waste Management contracted with two transportation companies, first, Dutch Boy Express, Inc. (Dutch Boy) and, later, Ryder Integrated Logistics, Inc. (Ryder), to haul its trailers from its transfer station in the City to landfills or recycling facilities and to return the empty trailers to the transfer station. Waste Management's agreements with both Dutch Boy and Ryder provided that Waste Management would pay those companies on a per load or per hour basis. In providing hauling services to Waste Management, Dutch Boy and Ryder either used their own tractors and drivers or contracted with third parties. There was no separate charge or payment for the use of the tractors. Moreover, neither company charged sales tax on the amounts that Waste Management paid for the hauling services.

### C. Procedural History

The City conducted a tax audit of Waste Management for the period from July 1, 2003 to June 30, 2006. Upon completion of this audit, the City notified Waste Management of a tax deficiency and assessment. The assessment sought to collect sales or use taxes on Waste Management's revenues from roll-off services provided to customers located in the City during the audit period. The assessment also sought to collect sales or use taxes on the amounts charged to Waste Management for the hauling services provided by Dutch Boy and Ryder during that period. The City claimed that both types of transactions were taxable under section 20-4-7 of the Code, which imposed sales or use tax on the purchase price paid or charged, or for any consideration for the furnishing of, tangible personal property in certain transactions.

Waste Management timely appealed the deficiency notice in a letter to the City's Director of Finance. In this letter, Waste Management asserted that because it does not sell, rent, lease, or charge for furnishing the roll-off containers to its customers, the roll-off service is not subject to sales tax under the Code. Waste Management further argued that because the hauling companies do not sell, rent, lease, or charge for furnishing tangible property to Waste Management, the hauling service likewise is not subject to the City's sales or use tax. A hearing officer subsequently upheld the imposition of sales and use taxes on the above-described transactions, but for reasons not at issue here reduced the amount of Waste Management's purported tax liability.

Waste Management then timely filed a complaint and notice of appeal in the district court, seeking de novo review of the hearing officer's decision to assess sales tax in connection with Waste Management's roll-off service and use tax on the above-described hauling services. Waste Management also appealed, in the alternative, the hearing officer's failure to provide a credit for the sales or use taxes it had paid when it purchased the roll-off containers, arguing that the imposition of sales or use tax both when Waste Management purchased the roll-off containers and when it provided roll-off services to customers would result in double taxation. Thereafter, the parties filed cross-motions for summary judgment.

The district court ultimately granted Waste Management's summary judgment motion and denied the City's summary judgment motion. The court determined that Waste Management's roll-off service and the contracted hauling services are not subject to sales or use tax under the Code.

The City now appeals.

## II. Standard of Review

We review the district court's grant of summary judgment and its interpretation of the applicable Code provisions de novo. *Williams v. State Farm Mut. Auto. Ins. Co.,* 195 P.3d 1158, 1160 (Colo.App.2008) (appellate court reviews the grant of summary judgment de novo); *Bd. of County Comm'rs v. ExxonMobil Oil Corp.,* 192 P.3d 582, 585 (Colo.App.2008) (statutory interpretation is a question of law that appellate court reviews de novo), *aff'd,* 222 P.3d 303 (Colo.2009).

When reviewing a municipal ordinance or code, we construe it using the same rules that we use in interpreting statutes. *Mahaney v. City of Englewood,* 226 P.3d 1214, 1217 (Colo.App.2009). Our primary task in interpreting statutes and municipal enactments is to give effect to the intent of the drafters, which we do by looking to the plain language. *JJR 1, LLC v. Mt. Crested Butte,* 160 P.3d 365, 370 (Colo.App.2007); *see also Hygiene Fire Protection Dist. v. Bd. of County Comm'rs,* 205 P.3d 487, 490 (Colo. App.2008), *aff'd,* 221 P.3d 1063 (Colo.2009). We should read statutes and municipal enactments in such a way as to give effect to every word. *See Hygiene Fire Protection Dist.,* 205 P.3d at 490. We also must consider the language used in the context of the statute or code as a whole, and we must give effect to the ordinary meaning of the language and read the provisions as a whole, construing each consistently and in harmony with the overall statutory design, if possible. *Id.* Interpretations that will render words or phrases superfluous should be rejected. *Id.* Likewise, we must avoid interpretations that produce illogical or absurd results. *People v. Cross,* 127 P.3d 71, 74 (Colo.2006).

If the language of a statute or code provision is clear and the intent of the legislative body that enacted it may be discerned with certainty, we need not resort to other rules of statutory interpretation. *Western Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 573 (Colo.App.2006). We give deference to the interpretation provided by the officer or agency charged with the administration of the code or statute unless that interpretation is inconsistent with the legislative intent manifested in the text of the statute or code. *See Aberdeen Investors, Inc. v. Adams County Bd. of County Comm'rs,* 240 P.3d 398, —— (Colo.App. 2009); *cf. General Motors Corp. v. City & County of Denver,* 990 P.2d 59, 74 & n. 15 (Colo.1999) (noting deference due to Denver manager of revenue's interpretation of sales and use tax exemption in city code). Moreover, when the language of the statutory or code provision at issue is ambiguous, we may also look to legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme to ascertain the correct meaning of the provision. *Bd. of County Comm'rs v. Costilla County Conservancy Dist.,* 88 P.3d 1188, 1193 (Colo.2004).

Finally, it is a longstanding rule of construction in Colorado that tax provisions like those at issue here will not be extended beyond the clear import of the language used, nor will their operation be extended by analogy. *City of Boulder v. Leanin' Tree, Inc.,* 72 P.3d 361, 367 (Colo.2003). In addition, we must construe all doubts against the government and in favor of the taxpayer. *Id.*

## III. Discussion

Because section 20–4–7 of the Code was amended during the tax audit period at issue here, we must consider both the pre- and post-amendment versions of that section.

Prior to March 2006, section 20–4–7 provided, in pertinent part:

> On the purchase price paid or charged or for any consideration for the furnishing of tangible personal property, together with the services of an operator thereof, for any person, shall be taxable hereunder as a rental or use of such personal property, irrespective of the fact that during all times that the said property is so furnished or used, the control of the operation of the same remains in the person so providing the said property except that the use of machinery or equipment by a contractor in the performance of a service contract and not as a rental of machinery or equipment shall not be taxable.

> As used in this section, a "service contract" shall be construed to mean a written con-

tract that provides for the performance of defined work by a contractor for the benefit of a contracting party, having for its purpose the completion of said contract work without direction or supervision by the contracting party as to the specific method of performance or the specific machinery or equipment to be used in the performance of such work.

This section was amended in March 2006. As amended, it provided, in pertinent part:

On the purchase price paid or charged or for any consideration for the furnishing of tangible personal property, together with or without the services of an operator, used in the performance of a contract or agreement for any person, shall be taxable hereunder as a rental for use of such personal property, irrespective of the fact that during all times that the said property is so furnished or used, the control of the operation of the same remains in the person so providing the said property except that the use of equipment by a contractor in the performance of a service contract shall not be taxable.

As used in this section, a "service contract" shall be construed to mean a contract or agreement that has, for its basic purpose, the performance of labor for the benefit of a contracting party with incidental use of equipment or machinery with no use of heavy equipment or motor vehicles.

The City contends that the roll-off service transactions and the hauling transactions involved the furnishing of tangible personal property and, therefore, were taxable under both the pre- and post-amendment versions of section 20–4–7 as a rental or use of such personal property. We disagree.

### A. Roll–Off Services

Our analysis here differs as to the pre- and post-amendment versions of section 20–4–7. Accordingly, we first discuss the pre-amendment version of that provision and then discuss the post-amendment version.

### 1. Pre–Amendment Version of Section 20–4–7

■ As to the pre-amendment version of section 20–4–7, we must first determine whether that section is clear and unambiguous, because if it is, then we must apply the provision as written and do not resort to other rules of statutory interpretation. For several reasons, we conclude that this section is not clear and unambiguous.

First, the code levied sales or use tax "[o]n the purchase price paid or charged or for any consideration for the furnishing of tangible personal property, *together with the services of an operator thereof.*" (Emphasis added.) This language is notably different from the post-amendment version of section 20–4–7, which levied tax "[o]n the purchase price paid or charged or for any consideration for the furnishing of tangible personal property, *together with or without the services of an operator,* used in the performance of a contract or agreement." (Emphasis added.)

The language in the pre-amendment version lends itself to several conflicting interpretations. On the one hand, it can reasonably be construed to mean that the section applied only to transactions in which tangible personal property was furnished together with the services of an operator. On the other hand, it can reasonably be read to mean that sales or use tax would be levied on the consideration paid in transactions in which tangible personal property was furnished along with an operator of the property, if an operator happened to be provided. We recognize that City of Commerce City Regulation No. 20–4–7 (2002) could be read to favor the latter construction, but we also must be mindful of the fact that such implementing regulations, although often entitled to deference, are not entitled to deference if they misapply or misconstrue the ordinance. *See Leanin' Tree,* 72 P.3d at 363.

Second, the pre-amendment version of section 20–4–7 provided that the use of machinery or equipment by a contractor in the performance of a service contract was not taxable. The definition of "service contract," however, is unclear. The definition appears to have excluded from the exemption for service contracts those contracts that involved solely the provision of services (i.e., with no machinery, equipment, or tangible personal property furnished or used), if the

contracting party directed or supervised the specific method of performance. Such an interpretation, however, would render this part of the pre-amendment version of section 20–4–7 superfluous, because no tax would be levied on such a transaction in any event, given that no tangible personal property would have been furnished.

Third, the definition of "service contract" appears to have excluded from the service contract exemption those contracts in which the contracting party sought the completion of a service and also directed or supervised the specific machinery or equipment to be used. This language, too, however, is amenable to various interpretations. For example, on the one hand, it could be construed to mean that the service contract exemption would have been inapplicable had the contracting party directed the contractor as to how to use the equipment provided. On the other hand, it could be interpreted to mean that the exemption would have been inapplicable had the contracting party selected the specific machinery or equipment to be used.

Finally, although the City contends that the pre-amendment version of section 20–4–7 was intended to have the broadest possible scope, reaching any transaction in which tangible personal property was somehow used or furnished, we conclude that such a construction would be inconsistent with the provision's language and would lead to absurd results. Specifically, such an interpretation would render the service contract exemption essentially meaningless, because some sort of equipment, machinery, or tangible personal property would likely have been used in virtually every service contract. For example, as Waste Management argues, if a lawyer sends a legal memorandum to a client in a manila envelope, under the City's interpretation, the envelope in such a transaction, and perhaps the paper on which the memorandum is written, would be taxable. Because such a result would clearly be absurd, we may not adopt the City's proposed construction, *see Cross*, 127 P.3d at 74, which we believe only highlights the various ambiguities in the pre-amendment version of section 20–4–7.

Because we conclude that this version of section 20–4–7 is not clear and unambiguous, we are unable to discern from its text alone precisely how to determine the taxability of the roll-off service transactions at issue here, which arguably involved the provision of both services and tangible personal property. Accordingly, we must turn to the applicable rules of construction.

The parties dispute which of such rules applies in a case like this one. The City argues that the "necessarily included" test purportedly set forth in *AT & T Communications of Mountain States, Inc. v. City of Boulder*, 775 P.2d 53 (Colo.App.1988), provides the proper rule of construction. Waste Management disagrees and contends that the rule set forth in *Leanin' Tree*, 72 P.3d at 366–67, provides the appropriate analytical framework. We agree with Waste Management.

*AT & T Communications*, 775 P.2d at 54, on which the City relies, does not establish a "necessarily included" test, as the City contends. Indeed, that phrase is not mentioned anywhere in the opinion. Nor does the substance of the opinion establish such a test.

There, AT & T purchased access services from Mountain States Telegraph and Telephone Company (Mountain Bell). *Id.* A hearing officer found, and the district court agreed, that (1) the access charges paid by AT & T enabled it to "use" Mountain Bell's transmission and switching equipment to transmit interchange calls to and from the City of Boulder, and (2) under Boulder's tax code, AT & T's payment was a purchase of "tangible property" and therefore was taxable. *Id.* Construing the plain language of several Boulder tax code provisions, a division of this court affirmed those determinations, albeit with limited analysis. *Id.* Nothing in the division's opinion, however, articulated, or even suggested, a test by which a transaction that involves the provision of both tangible personal property and services is taxable if the personal property was "necessarily included" in the transaction.

In *Leanin' Tree*, 72 P.3d at 363, 366–67, our supreme court adopted a multi-factor or totality of the circumstances test for what it

deemed "inseparably mixed transactions" (i.e., transactions involving the provision of both tangible personal property and either intangible personal property or services, and in which the property and services were intertwined as part of the transaction). Specifically, the court held that we must apply reasonable and common understandings of "tangible" and "other-than-tangible" property to determine whether the transaction at issue was more analogous to a sale of goods or the purchase of a service or intangible right. *Id.* at 366; *see also id.* at 367 (Mullarky, C.J., concurring in part and dissenting in part) (agreeing that courts should apply "a multi-factor or totality-of-the-circumstances test to determine whether the transaction involved ... is the sale or use of tangible personal property," and agreeing further that "in applying the test, we should apply a practical, common sense understanding to determine the nature of the transaction").

Although it is true, as the City argues, that *Leanin' Tree* dealt with tangible and intangible personal property, we disagree with the City's assertion that the case was limited solely to those facts and thus does not apply to mixed transactions involving tangible personal property and services. Indeed, in *Leanin' Tree,* the court referred several times to mixed transactions involving tangible personal property, on the one hand, and intangible property or services, on the other hand. *See, e.g., id.* at 362, 365. Nor do we perceive the court's analysis in *Leanin' Tree* as limited to the language of the Boulder ordinance and implementing regulation there at issue. Rather, we read *Leanin' Tree* as establishing a broader rule of construction for inseparably mixed transactions where the code provision at issue is not clear and unambiguous as to how mixed transactions are to be treated. *See also Noble Energy, Inc. v. Colorado Dep't of Revenue,* 232 P.3d 293, —— (Colo. App. 2010) (applying *Leanin' Tree* to transactions in which a taxpayer hired oil well service companies to "fracture" oil and gas wells).

We likewise disagree with the City's assertion that the sixth paragraph of City of Commerce City Regulation No. 20–4–7 (2006) somehow distinguishes this case from *Leanin' Tree,* because that paragraph purportedly clarifies how mixed transactions are taxed. That paragraph provides, in pertinent part:

[A]ll charges in any sale wherein tangible property is conveyed to any degree as part of the sale to the customer and which involves labor and "service" together with the use of other tangible property as an actual, ordinary or necessary inclusion to convey to or make usable to the customer, such property is taxable to the full extent of the "purchase price" as defined herein.

*Id.*

This paragraph, however, does not clearly define "conveyed," which could be interpreted to require a sale or lease or merely the provision of such property. Moreover, this paragraph refers to both "tangible property" that is conveyed as part of a sale, on the one hand, and the provision of labor and service together with the use of "other tangible property as an actual, ordinary or necessary inclusion to convey to or make usable to the customer," on the other hand. The paragraph does not make clear, and the City does not explain, the distinction between "tangible property" and "other tangible property" or how the regulation applies here, where we perceive no "other tangible property" being used.

Notably, the rule adopted by the court in *Leanin' Tree* is consistent with the regulation of mixed transactions at the state level, to which regulations we may look for guidance, given their similarity to the code provisions at issue here. *See City of Englewood v. Hammes,* 671 P.2d 947, 952–53 (Colo.1983) (looking to a state statute defining mental state of "knowingly" for purposes of interpreting municipal ordinance containing the identical mental state). Specifically, special regulation 40 of section 201–5 of the Code of Colorado Regulations states, in relevant part:

Persons engaged in the business of rendering service are consumers, not retailers, of the tangible personal property which they use incidentally in rendering the service. Tax, accordingly, applies to the sale of the property to them....

. . . .

The basic distinction in determining whether a particular transaction involves a

sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, if the real object sought by the buyer is the service per se, the transaction is not subject to tax even thought [sic] some tangible personal property is transferred.

Div. of Taxation SR–40, 1 Code Colo. Regs. 201–5 (2009).

This regulation provides the following example to illustrate its intent:

[A] firm which performs business advisory, record keeping, payroll and tax services for small businesses and furnishes forms, binders, and other property to its clients, as an incident to the rendition of its services, is the consumer and not the retailer of such tangible personal property. The true object of the contract between the firm and its client is the performance of a service and not the furnishing of tangible personal property.

*Id.*

Thus, the state regulation, like the rule adopted in *Leanin' Tree,* requires looking at multiple factors to determine whether the principal object of a mixed property and services transaction is the provision of a service, even though tangible personal property might also be provided. *See also Noble Energy,* 232 P.3d at —— (noting that SR–40 incorporates a simplified "true object" test to determine the taxability of a mixed transaction).

Applying the *Leanin' Tree* test here, we conclude for several reasons that, considered in their totality, the roll-off services transactions at issue were not transactions for the furnishing of tangible personal property under the pre-amendment version of section 20–4–7.

First, as the district court found, the contracts involving the roll-off containers were unequivocally for the purpose of collection and disposal of waste. This tends to show that the contracts were focused on the provision of a service, rather than on the furnishing of a roll-off container.

Second, Waste Management did not charge a specific or identified portion of the contract price for use of the roll-off containers. Instead, customers paid Waste Management based on the quantity of waste collected or the frequency of collection from the customers' sites. These facts, too, suggest that customers were not paying any consideration for the roll-off containers themselves. Rather, they were paying for Waste Management's services in hauling away waste or recyclable materials.

Finally, Waste Management's standard form contract makes clear that the containers at all times remained the property of Waste Management. In addition, the contract imposes restrictions on customers' use of the containers. These facts also tend to show that no part of the consideration paid by the customers was for the roll-off containers.

On these undisputed facts, we agree with the district court's determination that Waste Management's roll-off service does not constitute the furnishing of tangible personal property. Our conclusion in this regard is consistent with the determinations reached by courts in other jurisdictions analyzing substantially similar facts and tax provisions, and we note that the City has not cited, and we have not seen, any cases to the contrary.

For example, in *Machinery Moving, Inc. v. Porterfield,* 26 Ohio St.2d 99, 269 N.E.2d 418, 419 (1971), the Ohio Supreme Court addressed the question of whether a refuse removal company's transfers of trash containers to its customers constituted taxable sales of tangible personal property, or whether the transfers were inconsequential parts of personal service transactions that were exempt from taxation. The court held that the containers were simply aids in the rendering of personal services, namely, the removal of trash, and, therefore, were functionally inconsequential to the total service performed by the refuse removal company. *Id.* Thus, the court held that these transactions were not taxable. *Id.* at 420.

Similarly, in *Sanitary Services Corp. v. Meehan,* 235 Conn. 393, 665 A.2d 895, 896 (1995), a trash removal company provided trash containers to customers but did not

charge separately for them. Moreover, the trial court had found that the company would not have been able to perform its refuse removal services without the containers. *Id.* On these facts, the Connecticut Supreme Court affirmed the trial court's determination that the true object of the transaction was the furnishing of trash removal services, not rental of the containers.

Finally, in *U–Need –A–Roll Off Corp. v. New York State Tax Commission,* 67 N.Y.2d 690, 499 N.Y.S.2d 921, 490 N.E.2d 840, 840 (1986), a trash removal company's customers were charged a flat fee for trash removal, without a separate rental charge for the use of the company's containers and compactors. On these facts, the New York Court of Appeals upheld the tax commissioner's determination that the company's transactions with its customers did not involve a rental of personal property.

Here, as in the foregoing cases, the record shows that the roll-off containers were merely aids to Waste Management in the provision of trash removal services. Moreover, as noted above, Waste Management did not charge separately for the containers, but rather charged a fee based on the quantity of waste collected or the frequency of collection from the customers' sites. Applying the reasoning of the courts in *Machinery Moving, Sanitary Services, and U–Need –A–Roll Off* to these undisputed facts confirms our view that, under the totality of the circumstances, the contracts at issue here were not contracts for the provision of tangible personal property. Accordingly, such transactions were not subject to sales or use tax.

Our conclusion in this regard is consistent with the City's own course of conduct here. Specifically, under the City's regulations, when an article of tangible personal property is acquired for subsequent rental, its acquisition is not subject to use tax. *See* City of Commerce City Regulation No. 20–3–59 (2008) ("If any article of tangible personal property is acquired by a business enterprise, duly licensed, for subsequent rental, that tangible personal property is not subject to the Use Tax on its acquisitions [sic] but is subject to the collection and remittance of the Sales Tax on the rental price of such property unless the business enterprise or individual made use of the property for their [sic] own and personal purpose prior to the property entering a rental status."); City of Commerce City Regulation No. 20–4–1 (2008) ("If a purchaser buys property to be used exclusively in the rental or leasing business and does not utilize that property for his own general business or personal use, prior to or for any period of time subsequent to the rental or lease, then the tax will fall on the rentals only and not on the initial purchase by the vendor or lessor.").

Here, it is undisputed that the City required Waste Management to pay sales or use tax when it initially purchased the roll-off containers. Thus, in accordance with its own regulations, the City necessarily determined that the provision of the roll-off containers to customers would not amount to a lease or rental of those containers. The import of the City's argument now, however, is precisely the opposite (i.e., that it properly levied a tax on the roll-off service transactions because they essentially involved a lease or rental of tangible personal property). The City cannot have it both ways. Having implicitly acknowledged when Waste Management first purchased the containers that providing those containers to customers would not be a lease or rental, the City cannot now impose sales or use tax on the roll-off service transactions on the ground that those transactions amounted to the furnishing of tangible personal property to the customers.

Nor are we persuaded that the third paragraph of Regulation 20–4–7 requires a different result. That paragraph provides, in pertinent part:

> [T]he tax will also apply whether or not the customer's "intent" is the purchase, lease, rental or contract use directly of the tangible personal property with the resultant "benefit" to himself or whether or not the "intent" of the customer is the purchase, lease, rental or contract use of the "benefit" inuring to him as the result of the use of such personal property and operator thereof by the owner or "vendor" of such property. [sic]

*Id.*

Although this paragraph purports to render the customer's subjective intent in a

transaction irrelevant, our conclusion here is not based on the subjective intent of either party. Rather, it is based on our interpretation of the applicable code sections and the nature of the contracts between Waste Management and its customers.

Finally, to the extent that there is doubt as to whether the roll-off service transactions should be characterized as transactions for the furnishing of tangible personal property under the pre-amendment version of section 20–4–7, we must resolve such doubt against the City and in favor of Waste Management. *See Leanin' Tree,* 72 P.3d at 367.

### 2. Post–Amendment Version of Section 20–4–7

█ As noted above, the post-amendment version of section 20–4–7 changed the phrase "together with the services of an operator" to read, "together with or without the services of an operator," thereby remedying one source of ambiguity in the provision. The amended version, however, also changed the definition of "service contract."

Under the post-amendment version of section 20–4–7, "service contract" was defined as "a contract or agreement that has, for its basic purpose, the performance of labor for the benefit of a contracting party with incidental use of equipment or machinery with no use of heavy equipment or motor vehicles." The phrases "basic purpose" and "incidental use," however, are undefined and, in our view, are not amenable to ready and consistent interpretation. Accordingly, we again must apply the *Leanin' Tree* analysis to assist us in construing these provisions. Indeed, that analysis is particularly well suited to this task, given its focus on determining the true nature of a transaction involving both the provision of services and tangible personal property, which is precisely the analysis that the amended version of section 20–4–7 requires.

For the reasons discussed above in connection with our analysis of the roll-off services transactions under the pre-amendment version of section 20–4–7, we conclude that these transactions, considered in their totality, were exempt service transactions within the meaning of the post-amendment version of section 20–4–7. Specifically, as the district court held, with record support, Waste Management's contracts with its roll-off service customers had, for their basic purpose, the performance of labor for the benefit of the customers, namely, the hauling away of waste and recyclable materials. Moreover, for the reasons noted above, in our view, the roll-off containers were merely aids to Waste Management in the provision of trash removal services. *See Machinery Moving,* 269 N.E.2d at 419.

We are not persuaded by the City's contention that the roll-off containers constituted "heavy equipment," within the meaning of the post-amendment version of section 20–4–7, thus removing the roll-off services transactions from the definition of "service contract." "Heavy equipment" is not defined in the Code. Common and ordinary usage of that phrase, however, connotes large, usually self-propelled or self-powered, construction equipment and machinery, such as bulldozers, pavers, cranes, crawler tractors and loaders, excavators, or backhoes. *See, e.g.,* Ark.Code Ann. § 26–52–318(a) (2010) (defining "heavy equipment" to include, among other things, asphalt and concrete pavers, boring machines, bulldozers, cable plows, cranes, crawler tractors and loaders, excavators, and loader backhoes); Minn.Stat. § 325E.068(2) (2010) (defining "heavy equipment" to include, among other things, excavators, crawler tractors, wheel loaders, backhoes, hydraulic hammers, cranes, and forklifts used in construction of buildings, highways, airports, dams, or other earthen structures); P.R. Laws Ann. tit. 9, § 3501(r) (2008) (defining "heavy construction equipment unit" as, among other things, any self-propelled vehicle used in the construction industry or with commercial, industrial, or agricultural purposes that is not classified as or excluded from the definition of "motor vehicle," and citing as examples traction machines, road rollers, tractors used for agricultural purposes, mechanical shovels, bulldozers, and excavators); Tex. Tax Code Ann. § 23.1241(a)(6) (Vernon 2009) (defining "heavy equipment" as "self-propelled, self-powered, or pull-type equipment"); Va.Code Ann. § 59.1–353 (2010)

(same); *see also* § 42–4–708, C.R.S.2009 (in section titled, "Moving heavy equipment at railroad grade crossing," referring to, among other things, crawler-type tractors, steam shovels, derricks, or rollers); Ky.Rev.Stat. Ann. § 224.16–070(2)(b) (West 2010) (citing "bulldozers, backhoes, and draglines" as examples of "heavy equipment").

Applying this ordinary and customary usage here, we reject the City's assertion that the roll-off containers at issue were "heavy equipment" within the meaning of the amended version of section 20–4–7.

Finally, as noted above, if there is doubt as to whether the roll-off service transactions at issue should be characterized as transactions for the furnishing of tangible personal property, we must resolve such doubt against the City and in favor of Waste Management. *See Leanin' Tree,* 72 P.3d at 367.

For these reasons, we conclude that the district court correctly held that the provision of roll-off containers was not subject to the City's sales or use tax under either the pre- or post-amendment version of section 20–4–7.

### B. Waste Hauling

With respect to the waste hauling transactions, for the reasons set forth above, we conclude that neither the prenor postamendment version of section 20–4–7 is clear and unambiguous. For example, although the City contends that the tractors provided by Dutch Boy and Ryder constituted tangible personal property, it is not clear to us that such tractors were furnished to Waste Management, given that Waste Management did not itself use or possess the tractors in any way. Accordingly, we proceed to analyze the hauling transactions under the *Leanin' Tree* analysis.

Applying the totality of the circumstances test to the hauling transactions at issue, we conclude for several reasons that such transactions were not transactions for the furnishing of tangible personal property.

First, both Dutch Boy and Ryder were paid either on a per load or per hour basis. Thus, as Waste Management argues, it would pay the same amount if ten loads were hauled by one tractor or if ten tractors hauled one load each. Such a payment scheme tends to show that Waste Management was paying for the hauling services and not for the furnishing of any tractors.

Second, Waste Management did not specifically require either Dutch Boy or Ryder to use tractors to perform the hauling services. Accordingly, the record does not support a conclusion that Waste Management was providing consideration for such tractors.

Third, Dutch Boy and Ryder retained possession, control, and ownership over all equipment used in performing their hauling services, including all tractors. Thus, the hauling companies' employees drove the tractors in whatever manner the companies saw fit to perform the hauling services. Moreover, Dutch Boy and Ryder were responsible for many, if not all, costs related to the hauling services, including fuel costs. Indeed, Dutch Boy's agreement with Waste Management provided that Dutch Boy "shall furnish at its sole cost and expense all labor, tractors, licenses, permits, equipment and other requirements necessary to provide transportation of the [w]aste." Likewise, Ryder's agreement with Waste Management stated that Ryder

> shall bear all costs incurred in performing the [s]ervices, including but not limited to: (i) all costs required to operate and maintain the [e]quipment in a condition and manner consistent with good business practices and industry standards and as required by applicable laws, ordinances and regulations; (ii) all other operating costs for or relating to the [e]quipment, personnel ..., insurance, fuel, permits, and licenses; and (iii) all taxes, tolls, expenses, fines and fees incurred in connection with the transportation of [w]aste.

Finally, the hauling companies' agreements with Waste Management did not restrict either Dutch Boy or Ryder from using their tractors for any other purposes.

Each of these undisputed facts shows that Waste Management paid no consideration for the hauling companies to furnish tangible personal property in the form of tractors. Moreover, as with the roll-off service trans-

actions discussed above, our analysis is not dependent on the subjective intention of either party, thus rendering the City's discussion of the third paragraph of Regulation 20-4-7 inapposite. For these reasons, we conclude that the district court correctly held that the hauling transactions were not subject to the City's sales or use tax.

Although we have found no published Colorado appellate court decisions on point, our conclusion in this regard is consistent with the decision of the Indiana Tax Court in *Mason Metals Co. v. Indiana Department of State Revenue,* 590 N.E.2d 672 (Ind. Tax Ct.1992), which involved facts substantially similar to those at issue here. In *Mason Metals,* a corporation that contracted with various motor carriers to transport its products challenged the assessment of sales and use tax on its lease agreements with one such motor carrier. *Id.* at 673–74. The central question before the court was whether the corporation had leased property in a retail transaction, thereby subjecting it to sales and use tax. *Id.* at 674. The court held that it had not done so and, therefore, was not subject to such tax. *Id.* at 676.

In reaching this conclusion, the court noted that whether a lease existed depended on the corporation's possession of and control over the property involved, with the substance, rather than the form, of the transactions determining the relevant tax consequences. *Id.* at 674–75. To make this determination, the court considered (1) the employment of the driver, (2) the right to direct movement of the vehicle, (3) the obligation to pay for costs and repairs, (4) the obligation to pay fuel costs, (5) the responsibility of garaging the vehicle, and (6) the payment of insurance and license fees. *Id.* at 675. The court found that the motor carrier maintained possession and control of the tractor, employed the driver, directed the movement of the tractor, paid for repairs on the tractor, paid the fuel costs, was responsible for garaging the vehicle, and reimbursed the corporation for insurance on the tractor. *Id.* In addition, the tractor was licensed in the motor carrier's name. *Id.* Each of these factors established that the motor carrier possessed and controlled the property involved. Therefore,

the transaction was not a lease and was not subject to sales or use tax. *Id.* at 676.

Here, as in *Mason Metals,* it is not disputed that (1) the tractor drivers were employed by Dutch Boy and Ryder, (2) the hauling companies controlled how the vehicles were moved, and (3) the hauling companies paid all applicable fees and costs, including fuel costs and license fees. Applying the reasoning of *Mason Metals* to these undisputed facts confirms our view that the hauling transactions at issue here were not subject to the City's sales or use tax.

Although the City again urges us to hold that the pre- and post-amendment versions of section 20–4–7 applied to service transactions where tangible personal property was used in connection with a service, for the reasons set forth above, we reject such a construction because it would be overbroad, it would lead to absurd results, and it would conflict with the language of the provisions themselves, which expressly identify exempt service transactions in which equipment is used incidentally.

■ We likewise reject the City's assertion that City Regulation No. 20–S.I. 14 (2002) shows that the hauling transactions were taxable. The City points to the language in the sixth paragraph of that regulation, which provides, "Common, Contract and Commercial Carriers, etc .... hiring individuals and leasing or renting those individual trucks and other equipment must pay the sales or use tax on such leases and rentals unless otherwise exempt under this Code." Here, for the reasons noted above, the hauling transactions at issue did not involve the leasing or rental of the hauling companies' tractors. Accordingly, section 20–S.I. 14 is inapplicable.

Finally, as noted above, to the extent that there is doubt as to whether the hauling transactions should be characterized as transactions for the furnishing of tangible personal property, we must resolve such doubt against the City and in favor of Waste Management. *See Leanin' Tree,* 72 P.3d at 367.

734

In light of our foregoing determinations, we need not address the remaining contentions raised by the parties.

IV.  Conclusion

For these reasons, the district court's judgment is affirmed.

Judge CASEBOLT and Judge BOORAS concur.