**TREECE, ALFREY, MUSAT & BOSWORTH, PC, Plaintiff–Appellee,**

v.

**DEPARTMENT OF FINANCE, City and County of Denver, Colorado, Defendant–Appellant.**

No. 11CA0026.

Colorado Court of Appeals, Div. II.

Nov. 23, 2011.

Treece, Alfrey, Musat & Bosworth, PC, Thomas N. Alfrey, Rusty D. Miller, Denver, Colorado, for Plaintiff–Appellee.

Douglas J. Friednash, City Attorney, Michelle Bush, Assistant City Attorney, Max Taylor, III, Assistant City Attorney, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

In this use tax dispute, defendant, the Department of Finance of the City and County of Denver (Denver), appeals the district court's judgment reversing a hearing officer's determination that plaintiff, Treece, Alfrey, Musat & Bosworth, P.C. (law firm), owed use tax upon the cost of obtaining copies of medical records from health care providers for the law firm's use in litigation. The court determined that payments by the law firm to health care providers did not constitute the purchase of tangible personal property in a retail sale. We affirm.

## I. Background

The law firm represents clients in civil litigation. As part of its practice, the law firm must acquire photocopies of medical records. The law firm generally receives an authorization to release the records from the opposing party or its individual client, provides the authorization to pertinent health care providers, receives paper copies of the medical records, and pays an invoice or billing statement generated by the health care provider. The law firm, in turn, receives reimbursement from either an insurer of its client or the client directly. When providing the records, the health care providers do not charge sales tax, the law firm does not pay sales tax, and the law firm does not charge a sales tax to its clients or the insurer. The records, which are kept in the law firm's files, are owned by the law firm, the insurer, or the individual client.

Denver conducted a routine tax audit of the law firm for the tax period from January 1, 2006 through December 31, 2008 and assessed use tax, penalties, and interest upon the law firm's costs paid to obtain copies of medical records. The law firm contested the assessment and requested a hearing. The hearing officer took evidence and upheld the assessment, concluding that the law firm "purchased tangible personal property for use in Denver in connection with its business and did not pay sales tax."

The law firm appealed that determination to the district court under C.R.C.P. 106(a)(4). The court concluded that the hearing officer had applied the appropriate legal standard to the facts but that his interpretation of the law was flawed. It held that "medical records acquired from a health care provider by a patient, or by a law firm in the course of civil litigation, have no purchase price, market value or other intrinsic monetary value." The court further concluded that, contrary to the conclusions of the hearing officer, payments remitted by authorized persons to health care providers for the records are not made in order to obtain information contained in the documents; instead, the information contained in the records are subject to disclosure irrespective of consideration. Thus, acquisition of the information is a matter of statutory right as opposed to a commercial or retail exchange. Finally, the court concluded that medical records are tangible personal property but the expenditures to obtain those records reflect only the cost incurred for the service of locating, reproducing, and making the records available.

Accordingly, the court held that the hearing officer had abused his discretion and reversed the tax assessment.

Denver contends that the hearing officer's findings of fact are supported by competent evidence and that he properly applied the pertinent legal standard. Hence, it contends, the trial court erroneously reversed the hearing officer's determination. We disagree and therefore affirm, although on different grounds.

## II. Standard of Review

■ C.R.C.P. 106(a)(4) provides for judicial review of agency action "[w]here any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law." In determining whether there is an abuse of discretion, a reviewing court also may consider whether the administrative agency misconstrued or misapplied the law and, in so doing, may address issues involving mixed questions of law and fact. *Talbots, Inc. v. Schwartzberg*, 928 P.2d 822, 823 (Colo.App.1996).

■ We review a governmental body's or officer's interpretations of the law de novo. *Van Sickle v. Boyes*, 797 P.2d 1267, 1274 (Colo.1990). When reviewing a municipal ordinance or code, we construe it using the same rules that we use in interpreting statutes. *Waste Management of Colo., Inc. v. City of Commerce City*, 250 P.3d 722, 725 (Colo.App.2010).

■ Our primary task in interpreting statutes and municipal enactments is to give effect to the intent of the drafters, which we do by looking to the plain language. *Id.* We should read statutes and municipal enactments in such a way as to give effect to every word; we must consider the language used in the context of the statute or code as a whole; and we must give effect to the ordinary meaning of the language and read the provisions as a whole, construing each consistently and in harmony with the overall statutory design, if possible. *Id.* We should reject interpretations that will render words or phrases superfluous and must avoid interpretations that produce illogical or absurd results. *Id.*

■ We give deference to the interpretation provided by the officer or agency charged with the administration of the statute or code unless that interpretation is inconsistent with the legislative intent manifested in the text of the statute or code. *Id.*

■ Finally, a longstanding rule of construction in Colorado states that tax provisions like those at issue here will not be extended beyond the clear import of the language used, nor will their operation be extended by analogy. *City of Boulder v. Leanin' Tree, Inc.*, 72 P.3d 361, 367 (Colo.2003). In addition, all doubts will be construed against the government and in favor of the taxpayer. *Id.*

## III. Law

Denver Revised Municipal Code (D.R.M.C.) § 53–96 provides:

There is levied and there shall be collected and paid a tax in the amount stated in this article, by every person exercising the taxable privilege of storing, using, distributing or consuming in the city a service subject to the provisions of this article or any article of tangible personal property, purchased at retail, for said exercise of said privilege, as follows:

(1) On the purchase price paid or charged upon all sales and purchases of tangible personal property.

"Retail sale" is defined by D.R.M.C. § 53–95(21) as "any sale, as defined in this section, except a wholesale sale." "Retailer" is defined in D.R.M.C. § 53–95(22) as "any person selling, leasing, renting or granting a license to use tangible personal property or services at retail."

"Sale and/or purchase" is defined in D.R.M.C. § 53–95(23), in pertinent part as "every transaction, conditional or otherwise, based on consideration," "includ[ing] transactions whereby the acquisition of tangible personal property was effected by ... the transfer, conditionally or absolutely, of title or possession or both of the tangible personal property."

The term "use" is defined in D.R.M.C. § 53–95(32) as:

the exercise, for any length of time, by any person within the city of any right, power or dominion over tangible personal property or services either under a lease, or pursuant to a transaction whereby tangible personal property together with the services of an operator thereof, is furnished for another person, irrespective of the fact that during all times that the said property is so furnished, the control of the operation of the same remains in the person so providing the said property, or pursuant to a purchase at retail either within or without the city.

Where a business purchases tangible personal property in Denver for use in its business and does not pay sales tax, the business is obligated to pay use tax. *See* D.R.M.C. § 53–98(i).

## IV.  Application

Here, the parties agree that the physical documents obtained from health care providers pursuant to an authorization to release medical records constitute tangible personal property. However, the parties disagree whether the photocopies are "sold" or "purchased at retail" because hospitals and doctors are not in the business of selling medical records at retail; whether the photocopying of the records for litigation purposes is a retail sale for consideration because medical records must be furnished for inspection without charge upon the presentation of an authorization and they are not sold but photocopied; and whether the charge for photocopying reflects provision of a service, not a product. Resolution of these contentions requires us to first review the nature of medical records.

Medical records typically contain private information about the medical conditions of a patient and the course of treatment administered by the particular health care provider. Pursuant to section 25–1–1201, C.R.S.2011, "maintaining the confidentiality of medical records is of the utmost importance to the state and of critical importance to patient privacy for high quality medical care."

Section 25–1–1202, C.R.S.2011, provides an index of dozens of state statutes designed to protect confidentiality related to the release,

sharing, and use of medical records. One of those statutes, section 25–1–801, C.R.S.2011, specifies that a patient record maintained by a health care facility must be available for inspection by the patient or the patient's designated representative at reasonable times and upon reasonable notice. § 25–1–801(1)(a), C.R.S.2011. A patient or third party seeking to obtain a patient's medical record at a health care facility or from an individual health care provider can only do so with written authorization signed by the patient. *See* §§ 25–1–801(1)(b)(I), 25–1–802(1)(a), C.R.S.2011.

Section 25–1–801(1)(b)(I), pertaining to health care facilities, states in part that "copies of said records, including X rays, shall be furnished to the patient upon submission of a written authorization-request for records, dated and signed by the patient, and upon the payment of the reasonable costs." Section 25–1–802(1)(a) and (1)(b)(I), C.R.S.2011, provide similar language instructing health care providers that copies of medical records must also be made available to patients or their representatives upon payment of reasonable costs.

Reasonable costs in this context have been determined to include the cost of supplies and the labor required for retrieval and copying of the medical records. *Colo. Consumer Health Initiative v. Colo. Bd. of Health*, 240 P.3d 525, 531 (Colo.App.2010); *see also* Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d to 1320d–9 (1996) (HIPAA); 45 C.F.R. § 164.524(c)(4) ("[i]f the individual requests a copy of the protected health information … the covered entity may impose a reasonable, cost-based fee, provided that fee includes only the cost of (i) [c]opying, including the cost of supplies for and labor of copying, the protected health information requested by the individual"); W. Roach, Jr. et al., *Medical Records and the Law* 107 (2d ed. 1994) (price hospital charges for reproducing patient's medical record should be based on the facility's actual or reasonable cost to remove the record and duplicate requested portions).

Accordingly, a patient or authorized representative who seeks copies of a medical rec-

ord receives, upon payment of reasonable costs, both an item of tangible personal property (the physical documents themselves), and the services or rights that are other than tangible (the labor involved in physical retrieval and copying, as well as the information contained in the record).

■ Neither statutory provisions nor the record in this case allow for a meaningful separation of the cost of providing the services and intangible property from the cost of providing the actual paper document. When, as here, the various portions of a transaction are not meaningfully separable, we apply the "true object" test. *See Leanin' Tree*, 72 P.3d at 362–66; *Waste Management*, 250 P.3d at 728 (*Leanin' Tree* applies to mixed transactions involving tangible personal property and intangible property or services and its analytical framework is not limited to the Boulder regulation there at issue; instead, *Leanin' Tree* establishes a broad rule of construction for mixed transactions); *Noble Energy, Inc. v. Colo. Dep't of Revenue*, 232 P.3d 293, 296 (Colo.App.2010) (when a transaction combining delivery of services and tangible personal property products cannot be meaningfully separated into tangible and other-than-tangible components, courts determine its taxable nature according to its "true object"). Moreover, Denver does not contest the application of the *Leanin' Tree* test here and points out that the hearing officer employed that test as part of his analysis.

The factors the *Leanin' Tree* court found relevant in determining the true object of a mixed transaction include: (1) the value of the tangible property compared to that of the service; (2) whether there was an alternative method of transfer; (3) the length of time the intangible property, such as information, retained its value; (4) constraints on the buyer's ability to use the tangible property; (5) what is done with the tangible property after it has yielded its intangible component; (6) whether the tangible property represents the finished product sought by the buyer; and (7) the skill and expertise used to create the tangible property. *Leanin' Tree*, 72 P.3d at 365–66; *accord Noble Energy*, 232 P.3d at 298.

■ This "true object" test requires a court to analyze the "totality of the circumstances" to determine whether the true object, dominant purpose, or essence of the transaction is the acquisition of tangible personal property or the acquisition of intangible services. *Leanin' Tree*, 72 P.3d at 365–66. If the true object is the acquisition of tangible personal property, then the use tax applies; and if the purpose is the acquisition of intangible property or services, it does not. *Id.*

■ Applying these factors here, we conclude that, considered in totality, the obtaining of medical records photocopies is not a transaction for the furnishing of tangible personal property.

First, the value of the tangible property, the physical paper, is minimal compared to the value of the services and labor involved in retrieving and photocopying the records. Moreover, the law firm seeks information contained in the records. This tends to show that the focus is upon the purchase of a service that results in the provision of tangible and intangible property.

Second, there is an alternative means of transfer. The information may be stored electronically and transferred by the use of portable document files. This, also, shows that the focus is on the provision of a service. *See generally* 2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* ¶ 12.08[3] (3d ed. 2002) (accepted normative principles require functionally equivalent transactions to be taxed similarly).

Third, the information in the medical record retains its value only for a relatively brief time—during the lawsuit involving the patient. Once that action is concluded, the value of the information to the law firm disappears.

Fourth, the law firm has significant constraints on its ability to use the medical records. Its permission to use the information and the physical documents is limited by the numerous state and federal provisions that prevent disclosure to third parties. The law firm may use the information and documents by providing them to experts for their analyses, or in depositions or trial to refresh

memories or impeach contrary statements, or it may on some occasions introduce part of the records into evidence. But it cannot resell or freely transfer the medical records because they remain confidential. *See generally* §§ 25–1–801, 25–1–802; 45 C.F.R. § 164.524(b)(4)(i).

Fifth, after the documents have yielded their intangible component, the paper may be maintained in the records of the law firm's client or it may be discarded. The tangible property created by the photocopying is thus analogous to the materials used in *Noble Energy*, where the "fracking" materials were "disposed of as waste by the taxpayer immediately following the service." *Noble Energy*, 232 P.3d at 298. The *Noble Energy* division determined that the materials were not the true object of the transaction but merely incidental to the services provided. *Id.*

Sixth, the tangible portion of the property may or may not represent the finished product sought by the law firm. As noted above, the law firm may use the documents themselves, or it may simply use the information contained in them. In the latter situation, the law firm does not use the records as a finished product, but may structure its presentation of a case, examination of witnesses, and arguments around the information that is contained in those records, all of which require additional intellectual effort by the attorneys within the law firm.

Seventh, the degree of skill and expertise used to create the tangible property (the physical documents) is negligible.

Therefore, applying the *Leanin' Tree* factors, we conclude that the "true object" of the transaction is obtaining intangible information contained within the medical records by purchasing the services necessary to retrieve and copy them. Moreover, medical records are generally considered to be the property of the hospital or health care provider that created them and therefore neither title nor ownership passes to those who obtain photocopies of them. *See Medical Records and the Law* at 96. This transaction is therefore akin to the transaction in *Leanin' Tree*, where the court relied, to some extent, upon the fact that the creators of the artwork involved in that case retained their ownership of the creation.

The *Leanin' Tree* court noted that the necessary flexibility of such a "true object" analysis will inevitably leave the characterization of some transactions in doubt. 72 P.3d at 366. However, any doubts as to taxability will lead to construction of a taxing provision against the government and in favor of the taxpayer. *Id.* at 367. Here, to the extent there are any doubts as to the nature of the transaction, we resolve that doubt in favor of the law firm.

In light of this determination, we need not separately determine whether medical records are "purchased or sold at retail"; whether health care providers are "retailers"; or whether the obtaining of such records is "based upon consideration" within the meaning of the Denver tax ordinances.

We are not persuaded to reach a contrary conclusion by Denver's reliance upon regulations of the Colorado Department of Public Health and Environment, which state in relevant part that "the discharged patient or personal representative ... shall pay for the reasonable cost of obtaining a copy of his/her/patient record ... [A]ctual postage or shipping costs and applicable sales tax, if any, also may be charged." Access to Patient Medical Records, § 5.2.3.4, 6 Code Colo. Regs. 1011–1:II–5.2. By using the qualifying phrase "if any" relative to payment of sales tax, this state regulation takes no position at all with regard to whether Denver's use tax applies to charges for patient records.

Our conclusion is not contrary to several cases Denver cites, including *American Multi–Cinema, Inc. v. City of Westminster*, 910 P.2d 64, 66 (Colo.App.1995). There, a division of this court addressed whether motion picture reels distributed to movie theaters through a license constituted a "transfer of tangible personal property" subject to use tax. The division concluded that one or more reels of motion picture film, or cassettes of a video film, are items of tangible personal property because "it is impossible to separate the lease of the tangible object, the film, from the intangible license to use it." *Id.* at 66.

Here, while it may be possible to separate the tangible personal property (the physical paper documents) from the intangible right to view and use the information and the services provided to retrieve and photocopy the record, as evidenced by the fact that a patient or a representative may have access to the records without purchasing copies, even so, the separation is not meaningful here. *See Noble Energy*, 232 P.3d at 296 (even if prices of material used in "fracking" could be separated from the services, the issue is whether such materials are "meaningfully separable" under the *Leanin' Tree* test).

*Cinemark USA, Inc. v. Seest*, 190 P.3d 793, 795 (Colo.App.2008), is likewise distinguishable. There, a movie theater contended that its acquisition and use of motion picture reels was not subject to municipal use tax under *Leanin' Tree. Id.* The division concluded that, under the "true object" test, the "clear purpose" of the theater's transaction with film distributors was its use of the physical product, the motion picture reel, and therefore it was taxable. *Id.* at 797. The division reasoned that without the tangible film reel, the license to exhibit the motion picture fixed in the film reel would be valueless; therefore, the worth of the copyright and any payment therefor was dependent on it being transmitted within the corporeal film reel. *Id.* at 798.

Here, it is not the use of the physical product itself that the law firm is purchasing. Instead, in order to obtain the information to which it was entitled, it was paying for the services needed to retrieve and photocopy the records. In contrast to the determinative facts the division recited in *Cinemark*, here, the tangible component of the transaction is not necessarily a final product; the law firm's payment is not solely for the use of the physical documents; and without the copies, the information contained in the medical records still has value, but only for a limited time. Accordingly, *Cinemark* is distinguishable.

Although dealing with different statutory provisions and applying tests somewhat distinguishable from those set forth in *Leanin' Tree*, other jurisdictions have reached similar results. *See Woodward, Hobson, & Fulton L.L.P. v. Revenue Cabinet*, 69 S.W.3d 476, 481 (Ky.Ct.App.2002) (legislature did not intend that medical providers furnishing copies of patient records in compliance with a statute should be equated with retailers, or that applicants for such medical records should be equated with consumers); *Univ. of Mich. Bd. of Regents v. Dep't of Treasury*, 217 Mich. App. 665, 669, 553 N.W.2d 349, 351 (1996) (photocopies made at university library held not subject to sales tax because university not in the business of selling photocopies as a retail enterprise with a profit-making objective); *Frisch, Dudek & Slattery, Ltd. v. Wis. Dep't of Revenue*, 133 Wis.2d 444, 448, 396 N.W.2d 355, 357 (1986) (law firm not a "retailer" that owed sales tax on the photocopying charges billed to its clients; charges were not a mercantile transaction).

For all these reasons, we conclude that the district court did not err in reversing the decision of the hearing officer.

The judgment is affirmed.

Judge LICHTENSTEIN and Judge MILLER concur.