The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 2, 2020

**2020COA4**

**No. 18CA2165, *Am. Multi-Cinema, Inc. v. City of Aurora* —
Taxation — Municipalities — Sales and Use Tax**

A division of the court of appeals considers whether the City of
Aurora properly levied a use tax on American Multi-Cinema, Inc.'s
(AMC's) master licensing agreements (MLAs) with motion picture
distributors. The division follows *Cinemark USA, Inc. v. Seest*, 190
P.3d 793 (Colo. App. 2008), applying its analysis to new technology.
Because (1) the true object of the MLAs is to obtain tangible
personal property (the data files), and (2) AMC's exhibition of motion
pictures is not a resale exempt from the City's use tax, the division
affirms the district court's judgment upholding the City's use tax
levied on the MLAs.

Court of Appeals No. 18CA2165
Arapahoe County District Court No. 14CV30822
Honorable Kurt A. Horton, Judge

American Multi-Cinema, Inc., as successor-in-interest to AMC Showplace Theatres, Inc., d/b/a Arapahoe Crossing 16 and Southland Stadium 16,

Plaintiff-Appellant,

v.

City of Aurora,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE FOX
Tow and Casebolt*, JJ., concur

Announced January 2, 2020

Holland & Hart LLP, Christina F. Gomez, Jonathan S. Bender, Kyriaki Council, Denver, Colorado, for Plaintiff-Appellant

Kissinger & Fellman, P.C., Paul D. Godec, Denver, Colorado; Timothy Joyce, Assistant City Attorney, Aurora, Colorado, for Defendant-Appellee

Bryan Cave Leighton Paisner LLP, Stephen D. Rynerson, Denver, Colorado; Jacqueline E. Brenneman, North Hollywood, California, for Amicus Curiae National Association of Theatre Owners

Michael J. Axelrad, Senior Assistant City Attorney, Greeley, Colorado, for Amicus Curiae Colorado Municipal League, City of Fort Collins, City of Littleton, City of Longmont, City of Montrose, and City of Westminster

Philip J. Weiser, Attorney General, Noah C. Patterson, Assistant Solicitor General, Anne Mangiardi, Assistant Attorney General, Annie Lawson, Assistant

Attorney General, Denver, Colorado, for Amicus Curiae Colorado Department of Revenue

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1 Plaintiff, American Multi-Cinema, Inc. (AMC), appeals the district court's judgment finding that defendant, City of Aurora, properly levied a use tax on AMC's master licensing agreements (MLAs) with motion picture distributors. We affirm.

## I. Background

¶ 2 AMC generates revenue by exhibiting motion pictures and selling admission tickets to the public. AMC's MLAs authorize it to exhibit motion pictures for a licensing fee, and AMC then pays distributors a percentage of its admission sales. AMC has paid the City a use tax — levied on tangible property used, stored, distributed, or consumed in the City — on its MLA fees since it began operation. AMC previously received motion pictures from distributors in the form of 35-millimeter film reels but later replaced the celluloid film technology with digital equipment and now receives motion pictures via digital files on portable hard drives.



Portable Hard Drives

¶ 3    On November 1, 2012, AMC filed two refund claims with the City, seeking a $191,634.06 refund from use taxes paid on licensing fees from May 27, 2010, through September 27, 2012.  During this timeframe, AMC used digital files to exhibit motion pictures at its two Aurora theatres.  Arguing that the digital files were not tangible personal property in the district court — on appeal, AMC no longer disputes that the digital files are tangible personal property — AMC claimed that its MLA fees could no longer be subjected to the City's use tax.  The City denied AMC's refund claims in full, and AMC appealed to the City's Finance Director, who also rejected AMC's claims.

¶ 4 On March 26, 2014, AMC appealed to the district court. After a bench trial, the district court upheld the City's use tax, finding that (1) the data files were tangible personal property under the City's code; (2) the true object of the MLAs was to acquire the data files rather than to obtain the intangible right to exhibit; and (3) the MLAs were not exempt from the use tax as a purchase for resale. AMC appealed.

## II. Use Tax

¶ 5 AMC argues that the district court erred by concluding that (1) the "true object" of the MLAs was to obtain tangible personal property and (2) AMC was not exempt from the use tax because the MLAs were not a wholesale transaction. We disagree.

### A. Preservation, Standard of Review, and Statutory Construction

¶ 6 The parties generally agree that AMC preserved its arguments for appeal. However, the City contends that AMC did not previously argue that its licensing agreements were exempt from the use tax as "an ingredient of a manufactured or compounded product, in the regular course of a business." Aurora Mun. Code § 130-198(2). Because AMC argued that it was exempt from the use tax under section 130-198(2) before the district court, we consider its

argument sufficiently preserved for appeal. *See Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010) ("[T]o preserve the issue for appeal all that was needed was that the issue be brought to the attention of the trial court and that the court be given an opportunity to rule on it.").

¶ 7 Pursuant to section 39-21-105(2)(b), C.R.S. 2019, a taxpayer may appeal its local government's final taxing determination to the district court, and the district court shall try the case de novo. *See also Noble Energy, Inc. v. Colo. Dep't of Revenue*, 232 P.3d 293, 295-96 (Colo. App. 2010). On appeal, we defer to the district court's factual findings and disturb them only if they are clearly erroneous and lack any support in the record. *Id.* at 296. But, we review the district court's application of the law and a governmental body's interpretation of the law de novo. *Treece, Alfrey, Musat & Bosworth, PC v. Dep't of Fin.*, 298 P.3d 993, 996 (Colo. App. 2011); *Noble Energy, Inc.*, 232 P.3d at 296.

¶ 8 To the extent our analysis requires application of the City's tax laws, we construe a municipal code using the same rules that we use in interpreting statutes. *Waste Mgmt. of Colo., Inc. v. City of*

4

*Commerce City*, 250 P.3d 722, 725 (Colo. App. 2010). In construing legislation, we look first to the plain language, reading the statutory provision as a whole and in such a way as to give effect to every word. *Id.* We reject interpretations that will render words or phrases superfluous and avoid interpretations that produce illogical or absurd results. *Id.* When "the body enacting particular legislation has not expressly defined a term," we give that term "its ordinary meaning." *City & Cty. of Denver v. Expedia, Inc.*, 2017 CO 32, ¶ 18. If a tax code's language is clear, we need not resort to other rules of statutory interpretation. *Waste Mgmt. of Colo., Inc.*, 250 P.3d at 725.

¶ 9 We defer to the interpretation provided by the agency charged with the administration of the tax code unless that interpretation is inconsistent with the legislative intent. *Id.* But statutory provisions establishing and defining the scope of a tax "will not be extended beyond the clear import of the language used, nor will their operation be enlarged by analogy." *Noble Energy, Inc.*, 232 P.3d at 296 (citation omitted). Thus, we resolve all doubts against the government and in favor of the taxpayer. *Id.*

5

¶ 10 However, this principle is inapplicable when a taxpayer claims a statutory exemption from taxation. *Id.* In such cases the presumption is reversed, and the taxpayer has the burden of proving entitlement to the exemption claimed. *Id.*

### B. Applicable Law

¶ 11 The City levies a use tax on

> every person in the city . . . for the privilege of using, storing, distributing, or consuming in the city any tangible personal property . . . or taxable service purchased, leased or rented and not subjected to the city sales tax, without regard to whether the property is purchased from sources within or without the city.

Aurora Mun. Code § 130-196(a). The City defines "use tax" as a tax paid "by a consumer for using, storing, distributing or otherwise consuming tangible personal property or taxable services inside the city." Aurora Mun. Code § 130-31. The code defines "tangible personal property" as "personal property that can be one or more of the following: seen, weighed, measured, felt, touched, stored, transported, exchanged, or that is in any other manner perceptible to the senses." *Id.* The stated intent of the City's use tax is to ensure that "every person who stores, uses, distributes, or consumes in the city any tangible personal property or taxable

6

services purchased, leased or rented at retail" is taxed because they are "exercising a taxable privilege." Aurora Mun. Code § 130-33(b).

¶ 12   The City's tax code exempts from use tax the "storage, use or consumption of any tangible personal property purchased for resale in this city, either in its original form or as an ingredient of a manufactured or compounded product, in the regular course of a business." Aurora Mun. Code § 130-198(2). To determine whether a company's purchase of tangible personal property is for resale, we ask "whether the primary purpose of the purchase was the acquisition of the item for resale in an unaltered condition and basically unused by the purchaser." *Coors Brewing Co. v. City of Golden*, 2013 COA 92, ¶ 32 (quoting *Conoco, Inc. v. Tinklenberg*, 121 P.3d 893, 896 (Colo. App. 2005)).

¶ 13   In *American Multi-Cinema, Inc. v. City of Westminster*, 910 P.2d 64, 66 (Colo. App. 1995), a division of this court held that a movie theater's use of film reels received from distributors to exhibit motion pictures to the public constituted "use" of "tangible personal property" for use tax purposes. Because the theater obtained a finished product in the form of tangible film reels, the division held

7

it was "impossible to separate the lease of the tangible object, the film, from the intangible license to use it." *Id.*

¶ 14    In determining whether a use tax may be applied to transactions with tangible and intangible aspects, our supreme court held in *City of Boulder v. Leanin' Tree, Inc.*, 72 P.3d 361, 366 (Colo. 2003), that courts must "identify characteristics of the transaction at issue that make it either more analogous to what is reasonably and commonly understood to be a sale of goods, or more analogous to what is generally understood to be the purchase of a service or intangible right."  This "true object" test "requires a court to analyze the 'totality of the circumstances' to determine whether the true object . . . of the transaction is the acquisition of tangible personal property or the acquisition of intangible services."  *Treece, Alfrey, Musat & Bosworth, PC*, 298 P.3d at 998 (quoting *Leanin' Tree*, 72 P.3d at 365-66).  If the true object is for tangible personal property, then the use tax applies; but, if the true object is for intangible property or services, then it does not.  *Id.*

¶ 15    Examining whether the true object of a transaction is a tangible good or an intangible right, the *Leanin' Tree* court noted

8

that a variety of factors aid this analysis, including (1) the value of the tangible property compared to that of the intangible property or service; (2) whether there was an alternative method of transfer; (3) the length of time the information provided retains its value; (4) whether there were constraints on the buyer's ability to use the tangible property; (5) what was done with the tangible property after it yielded the intangible component; (6) whether the tangible property represented the finished product sought by the buyer; and (7) the skill and expertise used to create the tangible and intangible aspects of the transaction. *Leanin' Tree*, 72 P.3d at 365-66. The *Leanin' Tree* court acknowledged that while "some multi-factor or totality of circumstances test" is unavoidable to determine the true object of a transaction, the "flexibility of such an analysis will inevitably leave the characterization of some transactions in doubt." *Id.* at 366-67. Thus, the circumstances of each case require individualized scrutiny.

¶ 16    Years later, in *Cinemark USA, Inc. v. Seest*, 190 P.3d 793 (Colo. App. 2008), a division of this court applied the *Leanin' Tree* factors to determine whether a movie theater's use of motion picture film

9

reels to display films to the public for profit was properly subjected to a local use tax. The division recognized that the theater's contracts "require it to use the films precisely in the form in which they are distributed" and were not "an option to use an idea of the film distributors," but rather were contracts to obtain "a physical object embodying the idea in its final form." *Id.* at 797-98. Accordingly, the division concluded that the true object of the theater's contracts with distributors was to obtain and use motion picture film reels — tangible final products — for exhibition; therefore, the transactions were properly subject to a use tax under the city's code. *Id.* at 799.

¶ 17    In reaching this conclusion, the division noted that, unlike the transaction in *Leanin' Tree*, Cinemark's exhibition of motion pictures via the tangible film reels more closely resembled "the method of payment for the use or exhibition of a finished piece of art, which the court in *Leanin' Tree* acknowledged was a taxable event." *Id.* at 798. While the division recognized that the transaction involved intangible copyrights, it noted that the theater was not "purchasing the copyright detached from the film" because

10

without "the transfer of the actual film, the license to exhibit it would be valueless." *Id.* at 798.

## C. "True Object" Analysis

¶ 18     On appeal, AMC does not dispute that the data files are tangible personal property. However, it argues that the true object of the MLAs is to obtain nontaxable intangible rights: the right to exhibit motion pictures. AMC contends that the *Leanin' Tree* factors support its assertion because (1) the intangible right to exhibit is more valuable than the tangible good — the data file — which is provided at no cost; (2) AMC can obtain the tangible data files by alternative means, and the transfer method used to obtain the motion pictures has no bearing on the licensing fee paid; (3) the information transmitted through the data files loses its value quickly because motion pictures generally achieve the highest value in the first two weeks after their release; (4) the MLAs significantly constrain AMC's use of the data files; (5) AMC does not retain the tangible property, as it must return the portable hard drives and delete the data files from its servers; (6) the data files are not a finished product because AMC must use special hardware and

11

software to translate the data files into the visual and sound elements required to show a motion picture; and (7) only a negligible degree of skill is needed to copy the data files onto hard drives but the intangible value of the motion picture requires expertise and artistic skill to create.

¶ 19    Neither party disputes that that the percentage of admission sales that the distributors receive is based on the intangible aspects of the motion pictures, derived from the films' intellectual and artistic content, rather than the value of a data file.  Accordingly, AMC contends that under *Waste Management* the true object of the MLAs must be to obtain the intangible right to exhibit.  We disagree.

¶ 20    In *Waste Management*, a division of this court concluded that the tangible aspects of the transaction "were merely aids" to the true object of providing a trash removal service.  *Waste Mgmt. of Colo., Inc.*, 250 P.3d at 729-30.  We disagree with AMC's explicit assertion that the intangible right to exhibit is more valuable than the tangible data file — and its implicit assertion that the intangible right is separable — because, as the *Cinemark* division recognized,

12

without "the transfer of the actual film, the license to exhibit it would be valueless." *Cinemark USA, Inc.*, 190 P.3d at 798. Thus, the data files are not "merely incidental" to the licensing agreements. *Cf. Noble Energy, Inc.*, 232 P.3d at 299 (holding that the true object of hiring the oil and gas well fracturing companies was to receive an intangible service because the tangible aspects of the service that involved the use of fracturing fluids and sands were merely incidental). The artistic skill needed to create a motion picture is admittedly greater than the skill needed to translate a motion picture into a data file. But, because the data file is an essential and necessary component to AMC's right to exhibit, we cannot conclude that the MLAs here more closely resemble the purchase of a service rather than a sale (or lease) of goods. *See Leanin' Tree, Inc.*, 72 P.3d at 366. Like in *Cinemark*, the true object of the licensing agreements here is to obtain, for the designated timeframe, tangible personal property that is inseparable from its intangible attributes. *See Malco Theaters, Inc. v. Roberts*, No. W2010-00464-COA-R3CV, 2011 WL 1598884, at *16 (Tenn. Ct. App. Apr. 26, 2011) (unpublished opinion) (holding that rented films

13

were tangible property because their physical aspects were "inseparable from their intangible intellectual property components").

¶ 21    The record supports AMC's assertions that the MLAs significantly constrain its use of the data files and that the transmitted motion pictures quickly lose their value after their initial exhibition.  And while the fee agreement in the MLAs is based on the underlying value of the motion pictures rather than the value of a data file, the tangible aspect of the mixed transaction retains value.  Indeed, the data files contain copyrighted material protected by extensive security measures and, while later returned by AMC, they are not discarded as waste.  *Cf. Treece, Alfrey, Musat & Bosworth, PC*, 298 P.3d at 999 (holding that, under the *Leanin' Tree* factors, the true object of the transaction was to obtain intangible information because "after the documents have yielded their intangible component, the paper may be . . . discarded"); *Noble Energy, Inc.*, 232 P.3d at 298 (holding that the tangible materials were not the true object of the transaction but merely incidental because, once consumed, the tangible aspects were "disposed of as

14

waste by the taxpayer immediately following the service"). It is widely known that after films cease being exhibited in theaters, there are secondary markets where additional value is realized. *See, e.g.*, *United States v. Syufy Enters.*, 903 F.2d 659, 665 n.9 (9th Cir. 1990) (considering whether a movie theater's distribution of motion pictures to ancillary markets for home viewing violated antitrust laws and recognizing that a "first-run theatrical exhibition enhances a film's performance in auxiliary markets").

¶ 22     AMC also argues that its ability to obtain motion pictures by alternative means, like the film reels, shows that the true object of the MLAs is intangible. We disagree. As AMC points out, it spent around $325 million nationwide and $1 million per theatre to convert its theaters from using the 35-millimeter film reels to digital equipment. Thus, returning to the film reels seems unlikely. *See Leanin' Tree, Inc.*, 72 P.3d at 365; *cf. Treece, Alfrey, Musat & Bosworth, PC*, 298 P.3d at 998 (concluding that the focus of the transaction was the "provision of a service" because there was an alternative means of transfer).

15

¶ 23     We similarly reject AMC's assertion that the data files it receives are not the finished product because it uses digital equipment to translate the data files into a motion picture.  In *Leanin' Tree*, the court recognized that the purchased art was not a finished product but rather was a "right to edit and publish" because the company used the artists' images to create "a new tangible object" that would be "sold as a new product."  *Leanin' Tree, Inc.*, 72 P.3d at 366.  Conversely, as AMC notes, it is significantly constrained in its ability to use the data files.  AMC is prohibited from using the data files other than to exhibit the motion pictures to its patrons — without alteration — for the agreed-upon exhibition period.  *See Treece, Alfrey, Musat & Bosworth*, 298 P.3d at 1000 (concluding that *Cinemark* was distinguishable because the transaction was not for the "use of the physical product itself," but was to obtain information and "the tangible component of the transaction [was] not necessarily a final product").  Although AMC returns the portable hard drives and deletes the data files from its servers, returning the tangible property here is largely immaterial.  *See Cinemark USA, Inc.,* 190 P.3d at 797.  While the *Leanin' Tree*

16

court concluded that the return of the original artwork was material, such a fact was important only because, as the *Cinemark* division noted, "it showed that the artwork was not being used as a final product." *Id.* Here, while the data files are returned (or deleted), they retain value because they contain copyrighted material. *Cf. Treece, Alfrey, Musat & Bosworth, PC*, 298 P.3d at 998-99 (holding that the transaction's focus was for the purchase of a service rather than on the tangible provision of paper because the value of the physical paper was "minimal compared to the value of the services and labor" and "after the documents have yielded their intangible component, the paper may be . . . discarded"). Applying the relevant *Leanin' Tree* factors, we conclude that access to the tangible data files was the true object of the MLAs because the value of the inseparable intangible copyright was dependent upon the data files being transmitted to AMC for use within the City. *See Cinemark USA, Inc.*, 190 P.3d at 798.

¶ 24    Lastly, we reject AMC's contention that *Cinemark* is inapplicable here because it involved a theater's use of film reels rather than the new digital equipment and digital data files that

17

AMC now uses.  AMC has historically paid a use tax on its licensing agreements, and we perceive no basis to abandon the *Cinemark* analysis because of a technological change.  AMC does not deny that the MLAs involve the use of tangible personal property: the data files.  And whether the motion pictures are transmitted via film reels or data films is of no moment; the underlying transaction remains the same.  *See Leanin' Tree, Inc.*, 72 P.3d at 366; *Cinemark USA, Inc.*, 190 P.3d at 798; *see also Malco Theaters, Inc.*, 2011 WL 1598884, at *16 (holding that the "fact that Malco may now receive the motion pictures via electronic transmission is irrelevant").

## D.    Use Tax Exemption

¶ 25     AMC next contends that it is exempt from the City's use tax because, even assuming that the true object of the MLAs is to obtain the tangible data files, the purpose of the MLAs is to acquire the data files for resale to its movie patrons.  AMC argues that because it cannot alter the data files, but rather may only use its unaltered version to exhibit to its patrons, the final consumers of the motion pictures are its patrons.  AMC also asserts that the exemption's purpose is to avoid double taxation of the same item,

18

and because AMC pays a sales tax on its admission fees, the City's use tax on AMC's MLA fees constitutes a double tax on its admission sales.

¶ 26    We agree with previous divisions of this court, which have held that a theater's exhibition of motion pictures is not a resale. *See Cinemark USA*, 190 P.3d at 799 ("Unlike in *Leanin' Tree*, where the ultimate consumers were the purchasers of the greeting cards[,] . . . Cinemark purchases the right to show copyrighted film reels and uses them as finished products . . . . Movie viewers are no more consumers of film reels than they are of seats, screens, or projectors used in movie theaters. Thus, because it acquires and displays a final product, we conclude Cinemark is the end user or consumer of the film reels."); *Am. Multi-Cinema, Inc.*, 910 P.2d at 67 ("The customers who pay a fee to watch the running of a motion picture are not given possession of the tangible film, nor do they seek to obtain such possession or any other right thereto. The fee they pay is simply to be able to view images from the film as they are projected onto the screen. Hence, the charge made by plaintiff for the privilege of viewing such images does not constitute a re-sale

of the film; it is plaintiff, not its customers, who is the ultimate 'user' of such tangible personal property."); *see also Expedia, Inc.*, ¶ 18; *Waste Mgmt. of Colo., Inc.*, 250 P.3d at 725. Because AMC does not resell the digital files but rather exhibits motion pictures for profit, it is the final consumer and is not exempt from the use tax under section 130-198(2) of the City's tax code. *See A.B. Hirschfeld Press, Inc. v. City & Cty. of Denver*, 806 P.2d 917, 923-24 (Colo. 1991) (holding that a commercial printing company's purchase of "pre-press materials" was not exempt from a use tax as a resale because it "could not perform the services it was contractually obligated to perform for its customers without [using] the pre-press materials. . . . Hirschfeld made substantial use of the pre-press materials for its own direct and indirect benefit"); *Coors Brewing Co.*, ¶ 39 ("[I]f a purchaser permanently diverts materials or items to its own use, the purchase of the materials or items is subject to [a] use tax because it is a retail purchase.").

¶ 27 Nor can we conclude that a double taxation has occurred. *See Am. Multi-Cinema*, 910 P.2d at 67 ("The use tax is levied upon plaintiff for the privilege of using the film by exhibiting it. The

20

admissions fee is levied upon its customers for the privilege of viewing the screen where the moving images are projected. Hence, not only is each tax levied upon different persons, but it is levied upon the exercise of different privileges arising out of separate transactions."). While the sales tax on AMC's admission revenues may impact its bottom line, AMC's inability to retain the entirety of its gross admission sales does not mean that double taxation has occurred. Rather, the use tax is "complimentary to sales tax, but is paid directly to the city rather than to a vendor collecting on behalf of the city" and "is simply 'sales tax that wasn't paid to the vendor.'" City of Aurora, General Use Tax, https://perma.cc/V5Y9-UNNW. The purpose of the City's use tax is to ensure that every person using, distributing, or consuming tangible personal property within the city's limits pay a use tax because it is "exercising a taxable privilege." Aurora Mun. Code § 130-33. Because AMC is using data files within the City's limits and is not reselling them — and its licensing agreements with distributors are not taxed elsewhere — AMC is not subjected to double taxation under the City's tax code. *See Noble Energy, Inc.,* 232 P.3d at 296 (recognizing that the party

claiming a tax exemption bears the burden of proving that such an exemption applies).

¶ 28    Alternatively, AMC contends that it uses the data files as "an ingredient of a manufactured or compounded product" for resale because the data files are transformed, using projectors, a screen, sound systems, and other equipment to become a new product for AMC's patrons.  We disagree.

¶ 29    The data files are not "an ingredient of a manufactured or compounded product" because AMC receives a final, finished product that it exhibits to its patrons unaltered.  *See Coors Brewing Co.*, ¶ 35 ("[I]tems or materials that are incorporated into a company's product and then sold to a consumer are not purchased for resale.").  Indeed, the MLAs expressly prohibit AMC from altering the films.  And, as AMC acknowledges, minimal expertise is needed to transmit the motion pictures onto data files and then project the movies on to a screen for patrons to view.  Because AMC exhibits the digital files for profit and is unable to alter or transform the motion pictures contained on the digital files, its MLA fees are not

exempt from the City's use tax as "an ingredient of a manufactured or compounded product" under section 130-198(2).

## III. Conclusion

¶ 30    We affirm the judgment.

JUDGE TOW and JUDGE CASEBOLT concur.