The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
Date January 21, 2021

## 2021COA4

**No. 20CA0859, People in the Interest of R.J.B. — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Legal Relationship — Appearance by Electronic Means; Constitutional Law — Due Process**

In this dependency and neglect proceeding, mother appeals the judgment terminating her parent-child legal relationship following a remote termination hearing via Webex. She claims that the court should have granted her a continuance so an in-person hearing could have been held, and the remote hearing didn't afford her due process or equal protection of the law.

The division concludes that the court didn't abuse its discretion in denying the continuance. The court's need to conduct the termination hearing via Webex didn't establish good cause to continue the hearing when a judge presiding over a hearing held via Webex can address any technical difficulties with sound, video feed,

or broadband issues as they arise; any delay in making an objection can be redressed by the court disregarding improperly admitted evidence; the court had extensively tested the virtual lobby and didn't allow a sequestered witness to hear any of the proceeding; Webex, as a real-time videoconference platform in which all participants may view one another, allows the court and all counsel to observe a witness's demeanor, determine if the witness is relying on documents or other information, and view admitted exhibits as well as other documents that may be used for impeachment; and the court ensured that an official record of the hearing was made in the same manner as during an in-person hearing.

The division also rejects mother's assertions that the remote hearing procedure failed to afford her due process and equal protection of the law. The division concludes that the juvenile court ensured that mother was provided substantially similar and fundamentally fair procedures as would have been available at an in-person termination hearing. So conducting the termination hearing via Webex afforded mother due process. The division didn't consider mother's equal protection claim because it is merely a bald assertion without argument or development.

COLORADO COURT OF APPEALS                                    **2020COA4**

Court of Appeals No. 20CA0859
City and County of Denver Juvenile Court No. 19JV225
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Appellee,

In the Interest of R.J.B., a Child,

and Concerning R.B.,

Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE HAWTHORNE*
Bernard, C.J., and Graham*, J., concur

Announced January 21, 2021

Kristin M. Bronson, City Attorney, Amy J. Packer, Assistant City Attorney, Denver, Colorado, for Appellee

Barry Meinster, Guardian Ad Litem

Ainsley Bochniak, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     In this dependency and neglect proceeding, R.B. (mother) appeals the juvenile court's judgment terminating her parent-child legal relationship with R.J.B. (the child) following a remote termination hearing conducted via the Webex remote video-conference platform. Mother claims that (1) the court should have granted her a continuance so an in-person hearing could have been held; (2) the remote hearing didn't afford her due process or equal protection of the law; and (3) there was a less drastic alternative to terminating her parental rights.

¶ 2     We conclude that the court's need to conduct the termination hearing via Webex didn't establish good cause to continue the hearing. We also reject mother's assertions that the remote hearing procedure failed to afford her due process and equal protection of the law. And, the juvenile court didn't err in determining that there was no less drastic alternative to termination. So we affirm the judgment.

## I. *The Dependency and Neglect Case*

¶ 3     In late January 2019, the Denver Department of Human Services learned that mother had been arrested on an outstanding warrant and the home that the child shared with mother and the

maternal grandmother was unsanitary and unsafe. Mother also admitted that she used methamphetamine, marijuana, and alcohol on a regular basis. And she agreed to place the three-year-old child in his godmother's care. But the Department was unable to keep in contact with mother and it initiated a dependency and neglect case the next month.

¶ 4 The juvenile court granted custody of the child to the Department for continued placement with the godmother. And it granted a default judgment adjudicating the child dependent and neglected.

¶ 5 Mother personally appeared at a hearing while she was incarcerated in July 2019. At that time, the court set aside the default judgment and adjudicated the child dependent and neglected based on mother's admission. It also adopted a treatment plan for mother.

¶ 6 Mother was released from custody less than two months later. Shortly after that, she stopped all contact with the Department. And she didn't personally appear at any further court hearings.

¶ 7 In March 2020, the Department filed a motion to terminate the legal relationship between mother and the child. About that same

time, the judicial department began implementing measures to mitigate the public health risk posed by the COVID-19 pandemic. *See* Office of the Chief Justice, Order Regarding COVID-19 and Operation of Colorado State Courts (Mar. 16, 2020), https://perma.cc/85XJ-9WG7. As part of these measures, the Chief Judge of the Denver Juvenile Court issued a directive that all hearings — including termination hearings — would be conducted on an electronic platform such as Webex. *See* Presiding Judge, Denver Juvenile Court Order (Mar. 27, 2020), https://perma.cc/ZX8D-MMNV.

¶ 8 Shortly before the termination hearing in late-April 2020, mother filed three motions asking the court to (1) find that an allocation of parental responsibilities (APR) to the godmother was a less drastic alternative to termination; (2) enter an APR order; and (3) continue the termination hearing.

¶ 9 The court denied mother's request for a continuance. And, following a contested termination hearing via Webex, the court determined that there was no less drastic alternative and terminated mother's parental rights.

## II. Continuance

¶ 10    Mother first contends that the juvenile court abused its discretion by denying her request to continue the termination hearing because the need to hold the hearing via Webex constituted good cause.  We disagree.

### A.  The Legal Standard

¶ 11    The Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child."  § 19-1-102(1)(c), C.R.S. 2020.  When ruling on a motion to continue a termination hearing, the court should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency.  *C.S. v. People in Interest of I.S.*, 83 P.3d 627, 638 (Colo. 2004).

¶ 12    Because the child was under the age of six when the dependency and neglect petition was filed, the expedited permanency planning (EPP) provisions apply.  *See* §§ 19-1-102(1.6), 19-1-123, C.R.S. 2020.  In EPP cases, the court shall not delay or continue the termination hearing unless good cause is shown and

the delay is in the child's best interests. §§ 19-3-104, 19-3-602(1), C.R.S. 2020.

¶ 13     A motion to continue is addressed to the court's discretion and we won't disturb its ruling on appeal absent a showing of an abuse of that discretion. *C.S.*, 83 P.3d at 638. A court abuses its discretion when its ruling is manifestly arbitrary, unfair, or unreasonable. *People in Interest of C.Y.*, 2018 COA 50, ¶ 13.

*B. Analysis*

¶ 14     Initially, we note that mother relies on language from the Denver District Court's COVID-19 directive. As pertinent here, that directive provides that all necessary participants in civil proceedings must appear remotely through telephone or teleconferencing options, but that any proceeding that the attorneys feel aren't capable of remote presentation can be continued at the court's discretion. *See* Chief Judge of the Second Judicial District, Amended Administrative Order Regarding Court Operations Under COVID-19 Advisory (Mar. 29, 2020), https://perma.cc/RC3G-RME8.

¶ 15     But this case was heard in Denver Juvenile Court, which is constitutionally separate from the Denver District Court. *See* §§ 13-

8-101, 13-8-102, C.R.S. 2020. So, the Denver District Court's COVID-19 directive is inapplicable to this proceeding. *See* § 13-8-115, C.R.S. 2020 (providing that the juvenile court has power to make rules for conducting its business to the extent that such rules don't conflict with supreme court rules or state laws).

¶ 16 In her motion, mother claimed that conducting the hearing by Webex would create a fundamentally unfair proceeding because of difficulties with

- hearing other parties;

- the video feed cutting in and out or freezing;

- the parties' broadband capabilities;

- making contemporaneous objections;

- effectuating a sequestration order while a witness waited in a virtual lobby;

- ascertaining whether witnesses were using documents or were in private communication with counsel or other parties;

- using documents to impeach a witness;

- offering exhibits;

- allowing the court and counsel to observe a witness's demeanor; and

- ensuring there was an adequate record of the hearing.

¶ 17    However, as the juvenile court recognized, for several reasons, these concerns were either unfounded or could be addressed at the hearing.

¶ 18    First, a judge presiding over a hearing held via Webex can address any technical difficulties with sound, video feed, or broadband issues as they arise.

¶ 19    Second, any delay in making an objection can be redressed by the court disregarding any slight delay in making the objection or disregarding improperly admitted evidence.  Indeed, we presume that all incompetent evidence is disregarded by the juvenile court. *See People in Interest of M.M.*, 215 P.3d 1237, 1249-50 (Colo. App. 2009).

¶ 20    Third, the court indicated that the virtual lobby had been extensively tested and didn't allow a sequestered witness to hear any of the proceeding.

¶ 21    Fourth, Webex is a real-time video-conference platform in which all participants may view one another.  *See White v. State,*

7

116 A.3d 520, 541 n.29 (Md. Ct. Spec. App. 2015). As such, it allows the court and all counsel to observe a witness's demeanor, determine if the witness is relying on documents or other information, and view admitted exhibits as well as other documents that may be used for impeachment.

¶ 22 And fifth, the court indicated that it would ensure that an official record of the hearing was made in the same manner as during an in-person hearing.

¶ 23 Also, mother's request to continue made no showing that delaying the hearing was in the child's best interests. Mother now claims that continuing the hearing would have served the child's best interests because he was in a permanent home and neither she nor any other party were seeking to move him from that home. But she didn't present this argument to the juvenile court.

¶ 24 For these reasons, we conclude that the court didn't abuse its discretion in denying mother's request to continue the termination hearing.

### III.  Termination Hearing by Webex

¶ 25     Mother next contends that the juvenile court violated her right to due process and equal protection of the law by conducting the termination hearing via Webex.  We aren't persuaded.

### A.  Due Process

¶ 26     We review a procedural due process claim de novo.  *People in Interest of C.J.*, 2017 COA 157, ¶ 25.  To establish a violation of due process, one must first establish a constitutionally protected liberty interest that warrants due process protections.  *Id.*

¶ 27     A parent has a fundamental liberty interest in the care, custody, and control of his or her child.  *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  To protect the parental liberty interest, due process requires the state to provide fundamentally fair procedures to a parent facing termination.  *A.M. v. A.C.*, 2013 CO 16, ¶ 28; *see also Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982).  These procedures must include a parent receiving notice of the hearing, advice of counsel, and the opportunity to be heard and defend.  *People in Interest of Z.P.S.*, 2016 COA 20, ¶ 40.  The opportunity to be heard must be provided at a meaningful time and in a

meaningful manner. *Patterson v. Cronin*, 650 P.2d 531, 537 (Colo. 1982).

¶ 28     Mother was afforded each of these procedures during the termination proceeding. She received ample notice of the Department's intent to seek termination of her parental rights at the April 2020 hearing. The record also shows that mother was represented by court-appointed counsel throughout the proceeding and given a meaningful opportunity to be heard and defend against the termination motion.

¶ 29     Even before the hearing, counsel filed motions urging the court to find that an APR to the godmother was a less drastic alternative to termination. And counsel appeared on mother's behalf at the termination hearing. During the hearing, the court offered counsel the opportunity to (1) give an opening statement; (2) cross-examine each of the witnesses called by the Department and guardian ad litem; (3) present additional evidence; and (4) make a closing argument.

¶ 30     The court also ensured that counsel's representation of mother wasn't hindered by holding the hearing via Webex. Counsel had the ability to observe each witness's demeanor by using the video

platform. The court also used the virtual lobby to ensure that sequestered witnesses were unable to hear other portions of the hearing. And, on the few occasions when mother's counsel or the court had been unable to hear a question or a witness's response to a question, the court asked the reporter to read back that portion of the record.

¶ 31 At one point, the court indicated that it was having difficulty hearing mother's counsel. But it immediately recessed to allow counsel to appear telephonically. The court could then easily hear counsel for the remainder of her cross-examination and closing argument.

¶ 32 Finally, mother claims that she wasn't given the opportunity to be heard and personally participate in the termination hearing because she was struggling with homelessness and lacked access to resources to appear via Webex. But at no point did mother alert the court that she faced this problem. Indeed, the court observed that if mother had indicated that she wanted to personally participate in the hearing, it would have made accommodations to ensure that mother was able to do so either by telephone or Webex. And in this

appeal, mother hasn't articulated how conducting the hearing via Webex diminished the effectiveness of her case.

¶ 33    We conclude that the juvenile court ensured that mother was provided with substantially similar procedures as would have been available at an in-person termination hearing.  So conducting the termination hearing via Webex afforded mother due process. *Cf. Clarington v. State,* No. 3D20-1461, 2020 WL 7050095, at *11, ___ So. 3d ___ (Dist. Ct. App. Fla. Dec. 2, 2020) (holding that conducting a probation hearing by remote technology does not violate the defendant's due process rights).

## *B.  Equal Protection*

¶ 34    Mother also contends that holding the termination hearing via Webex denied her equal protection of the law.  The right to equal protection of the law guarantees that parties who are similarly situated receive like treatment by the law.  But mother doesn't explain how she received disparate treatment compared to other parties who are similarly situated.  *See People in Interest of M.M.,* 726 P.2d 1108, 1117 (Colo. 1986).

¶ 35    In fact, mother's equal protection claim is merely a bald assertion without argument or development.  So we won't consider

it. *See Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 19 (Colo. App. 2010) (a bald legal proposition presented without argument or development won't be considered on appeal); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (a party may not merely mention a possible argument in the most skeletal way, leaving the court to be mind-readers and do counsel's work).

## IV. *Less Drastic Alternative to Termination*

¶ 36    Mother contends that the juvenile court erred by determining that an APR to the child's godmother wasn't a less drastic alternative to termination.  Again, we disagree.

### A. *The Legal Framework*

¶ 37    The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan wasn't successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.  § 19-3-604(1)(c), C.R.S. 2020; *People in Interest of C.H.*, 166 P.3d 288, 289 (Colo. App. 2007).

¶ 38     When considering termination under section 19-3-604(1)(c), the court must also consider and eliminate less drastic alternatives to termination. *M.M.*, 726 P.2d at 1122. This determination is implicit in, and thus intertwined with, the statutory criteria for termination. *People in Interest of L.M.*, 2018 COA 57M, ¶ 24. As a result, it is influenced by a parent's fitness to care for his or her child. *Id.* at ¶ 27.

¶ 39     And, as with all termination criteria, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3); *L.M.*, ¶ 29. Thus, for example, the court may consider whether an ongoing relationship with the parent would be beneficial or detrimental to the child and the child's need for permanency when determining whether there is a viable alternative to termination. *L.M.*, ¶ 29.

¶ 40     Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves applying the termination statute to evidentiary facts. *Id.* at ¶ 17; *see also In Interest of Baby A*, 2015 CO 72, ¶ 16 (a juvenile court's decision to terminate parental rights under section 19-5-105, C.R.S. 2020, presents mixed questions of fact and law). However,

14

we won't disturb the court's factual findings if they have record support. *People in Interest of A.J.L.*, 243 P.3d 244, 250 (Colo. 2010).

### B. The Record

¶ 41　The record reveals that the child was thriving in the godmother's care. And, as mother points out, the court had previously determined that this was a permanent home for the child.

¶ 42　Even so, the record shows that mother hadn't maintained any relationship with the child. Although the Department tried to arrange visits for mother through two different caseworkers as well as an external agency, mother failed to engage with any of the professionals. Mother didn't attend any visits with the child during the fourteen months the case was open, which negatively impacted the child. He had initially been upset and showed "a lot of backtrack in his behavioral outbursts" when scheduled visits didn't occur. The caseworker also observed that the child no longer referred to mother as "mom" and instead called her by her first name.

¶ 43    Mother was also unfit to care for the child.  She had made no effort to engage in substance abuse treatment to address her methamphetamine, alcohol, and marijuana use.  And she hadn't participated in a mental health evaluation or treatment to address her bipolar and depression diagnoses.

¶ 44    Also, the godmother testified that she had difficulty establishing appropriate boundaries with mother.  For example, during a chance encounter in the community, mother became upset when the godmother would not give her money.  The godmother also explained that mother had gone onto her Facebook page and copied a picture of the child with other members of the godmother's family.  Mother had then posted the picture on her own Facebook page and became belligerent when the godmother asked her to remove it.

¶ 45    Finally, the record shows that the child needed the permanency provided by adoption.  The godmother explained that adoption would allow the child to continue in the stable home environment that she and her family had provided for him.  And she wanted to be able to make key decisions for the child, such as when he should have contact with mother.  The godmother also

16

adamantly opposed caring for the child under a custody arrangement because mother would have the ability to return and ask the court to take the child away from her care.

¶ 46 The caseworker similarly opined that an APR would not provide the child with the permanency and stability that he needed. She explained that it was imperative that the child's progress made while in the godmother's care not be disrupted.

¶ 47 On this record, we discern no error in the juvenile court's determination that there was no less drastic alternative to termination.

### V. Conclusion

¶ 48 The judgment is affirmed.

CHIEF JUDGE BERNARD and JUDGE GRAHAM concur.